UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| MARK W. CUTLER,<br><br>                    Plaintiff,<br><br>    v.<br><br>CORRECTIONAL MEDICAL SERVICES (CMS), RONA SIEGERT, DR. GARRETT, R. YORK, D. CARLSON, KIM MILLER, LINDA GEHRKE, individually and in their official capacities,<br><br>                    Defendants. | Case No. 3:08-cv-00507-BLW<br><br>**MEMORANDUM DECISION AND ORDER** |

Pending before the Court are various motions filed by the parties that are ripe for adjudication. The Court ordered the parties to supplement the record, and the supplements have been filed. (Dkt. 92, 93, 94, 95.) Having fully reviewed the record, the Court finds that the parties have adequately presented the facts and legal arguments in the briefs and record and that the decisional process would not be significantly aided by oral argument. Therefore, in the interest of avoiding further delay, the Court shall decide this matter on the written motions, briefs, and record without oral argument. D. Idaho L. Civ. R. 7.1(d). Accordingly, the Court enters the following Order.

**MEMORANDUM DECISION AND ORDER - 1**

# BACKGROUND

When Plaintiff Mark Cutler (Plaintiff) filed his lawsuit, he was in the custody of the Idaho Department of Correction (IDOC). He has now completed his sentence, and is in the custody of the Bonner County Jail. (Dkt. 9.) Plaintiff's claims arise from his IDOC incarceration at the Idaho Correctional Institution - Orofino (ICIO).

Previously in this case, the Court determined that Plaintiff could proceed against: (1) Kim Miller, Linda Gehrke, and CMS on Plaintiff's claims of failure to provide care for chronic pain and suffering in Plaintiff's left hand and failure to provide adequate pain medication for chronic neck pain and headaches from April 2008 to March 2009; and (2) all CMS Defendants for failure to provide adequate treatment for Hepatitis C from January 2007 through March 2009.

All other claims against the Defendants were dismissed without prejudice. (Dkt. 41.) Plaintiff was required to provide a new service address for Dr. Garrett no later than May 31, 2010, and Plaintiff was notified that his failure to do so would result in dismissal of the claims against Dr. Garrett. (Dkt. 48.) Plaintiff failed to timely provide a new service address for Dr. Garrett to the Clerk of Court; thus all claims against Dr. Garrett were dismissed without prejudice. (Dkt. 50, 54.)

## SUPPLEMENTATION OF RECORD AND PLAINTIFF'S "MOTION AND AFFIDAVIT INFORMING COURT"

The parties were ordered to supplement the record regarding several unclear items in the record. (Dkt. 89.) The supplements have been filed and reviewed. (Dkt. 92, 93, 94.)

MEMORANDUM DECISION AND ORDER - 2

In addition, Plaintiff filed a "Motion and Affidavit Informing the Court," where he alleges that Defendants intentionally supplied incorrect information to the Court, and he asks the Court "to file criminal charges upon the Defendants for lying to the court." (Dkt. 95, p. 3.)

Upon a review of the record, the Court finds no evidence that Defendants intentionally attempted to mislead the Court by stating that an x-ray was an MRI; rather, it appears to have been a mistake, because Defendants explain that "[t]here was mention of an MRI in the order as well as an order for an x-ray to be taken of plaintiff's cervical spine, which was the reason for the error." (Dkt. 94, p. 2.) The medical record at issue is hardly legible. (Dkt. 66-8, p. 18.) The report itself does not clearly identify the type of test performed. (Dkt. 66-11, p. 22.) Defendants corrected their mistake when it was brought to their attention. (*Id*.)

The CMS Defendants were unable to find a medical record clearing Plaintiff for firefighting. Plaintiff states he fought fires until he fell at the sawshop and injured his neck, which appears to have been about April 2002. (Dkt. 93.) The medical record that Defendants referenced, a Progress Note of 4/10/08, is a rambling list of Plaintiff's physical activities over "the past 6-8 years." (Dkt. 94-1.) With Plaintiff's additional information, it is now clear that the reference was Plaintiff's past fitness for firefighting, rather than a notation that Plaintiff was presently cleared for fire fighting. Again, this appears to be a misreading by Defendants of an ambiguous medical record, rather than an intentional misrepresentation.

**MEMORANDUM DECISION AND ORDER - 3**

Neither the MRI reference nor the firefighting reference is essential to the Court's decision-making in this case. Sanctions are not appropriate on this record. Defendants' counsel are cautioned to take a greater degree of care in reviewing the medical records and preparing their affidavits in the future.[1] At the same time, the Court notes that seldom is there a mistake-free record in any case. Accordingly, Plaintiff's Motion will be denied.

## DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

All remaining Defendants assert entitlement to summary judgment on all of Plaintiff's remaining claims. (Dkt. 66, 71.) Plaintiff opposes summary judgment, asserting he has brought forward sufficient evidence to proceed to trial.

### 1.      Standard of Law Governing Summary Judgment

Summary judgment is appropriate where a party can show that, as to any claim or defense, "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). One of the principal purposes of the summary judgment "is to isolate and dispose of factually unsupported claims . . . ." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986). It is "not a disfavored procedural shortcut," but is instead the "principal tool[ ] by which factually insufficient claims or defenses [can] be isolated and prevented from going to trial with the attendant unwarranted consumption of public and private resources." *Id*. at 327.

---

[1] Rory York calls Plaintiff "Daniel" Cutler instead of William Cutler in paragraph 5 of his Affidavit, and refers to his Offender Tracking Sheet. (Dkt. 66-7.)The Offender Tracking Sheet submitted is for Plaintiff William Cutler, not "Daniel" Cutler, and so the mistake has no effect on the record. (Dkt. 66-11.) Similarly, another inmate's name,"Goodrick," is mistakenly mentioned in a heading of Defendants' brief, but not in the body. (Dkt 66-1, p. 8.)

**MEMORANDUM DECISION AND ORDER - 4**

"[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). The requirement is that there be no genuine dispute as to any *material* fact. "Material facts are those that may affect the outcome of the case." *See id.* at 248.

The moving party is entitled to summary judgment if that party shows that each material issue of fact cannot be disputed. To show that the material facts are not in dispute, a party may cite to particular parts of materials in the record, or show that the materials cited do not establish the presence of a genuine dispute, or that the adverse party is unable to produce admissible evidence to support the fact. Fed. R. Civ. P. 56(c)(1)(A)&(B); *see T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987) (citing *Celotex*, 477 U.S. at 322). The Court must consider "the cited materials," but it may also consider "other materials in the record." Fed. R. Civ. P. 56(c)(3).

Material used to support or dispute a fact must be "presented in a form that would be admissible in evidence." Fed. R. Civ. P. 56(c)(2). Affidavits or declarations submitted in support of or opposition to a motion "must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4).

The Court does not determine the credibility of affiants or weigh the evidence set forth by the non-moving party. All inferences which can be drawn from the evidence

**MEMORANDUM DECISION AND ORDER - 5**

must be drawn in a light most favorable to the nonmoving party. *T.W. Elec. Serv.*, 809 F.2d at 630-31 (internal citation omitted). If the moving party meets its initial responsibility, the burden then shifts to the opposing party to establish that a genuine dispute as to a material fact actually does exist. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).

The existence of a scintilla of evidence in support of the non-moving party's position is insufficient. Rather, "there must be evidence on which the jury could reasonably find for the [non-moving party]." *Anderson*, 477 U.S. at 252. Rule 56(e)(3) authorizes the Court to grant summary judgment for the moving party "if the motion and supporting materials–including the facts considered undisputed–show that the movant is entitled to it."

## 2.      Law Governing Eighth Amendment Claims

To state a claim under the Eighth Amendment, a plaintiff must show that he is incarcerated "under conditions posing a substantial risk of serious harm," or that he has been deprived of "the minimal civilized measure of life's necessities." *Farmer v. Brennan*, 511 U.S. 825, 834 (1994) (internal citation omitted). To prevail on an Eighth Amendment claim regarding prison medical care, Plaintiff must show that prison officials' "acts or omissions [were] sufficiently harmful to evidence deliberate indifference to serious medical needs." *Hudson v. McMillian*, 503 U.S. 1, 8 (1992) (citing *Estelle v. Gamble*, 429 U.S. 97, 103-04 (1976)). The Supreme Court has opined that "[b]ecause society does not expect that prisoners will have unqualified access to health

**MEMORANDUM DECISION AND ORDER - 6**

care, deliberate indifference to medical needs amounts to an Eighth Amendment violation

only if those needs are 'serious.'" *Id*.

> The Ninth Circuit has defined a "serious medical need" in the following ways:
>
> failure to treat a prisoner's condition [that] could result in further significant injury or the unnecessary and wanton infliction of pain; . . . [t]he existence of an injury that a reasonable doctor or patient would find important and worthy of comment or treatment; the presence of a medical condition that significantly affects an individual's daily activities; or the existence of chronic and substantial pain.

*McGuckin v. Smith*, 974 F.2d 1050, 1059-60 (9th Cir. 1992), *overruled on other grounds*,

*WMX Technologies, Inc. v. Miller*, 104 F.3d 1133 (9th Cir. 1997).

Deliberate indifference exists when an official knows of and disregards a serious

medical condition or when an official is "aware of facts from which the inference could

be drawn that a substantial risk of harm exists," and actually draws such an inference.

*Farmer v. Brennan*, 511 U.S. 825, 838 (1994). Thus, a defendant is liable if he knows

that a plaintiff faces "a substantial risk of serious harm and disregards that risk by failing

to take reasonable measures to abate it." *Id*. at 847. Differences in judgment between an

inmate and prison medical personnel regarding appropriate medical diagnosis and

treatment are not enough to establish a deliberate indifference claim. *See Sanchez v. Veld*,

891 F.2d 240, 242 (9th Cir. 1989).

Mere indifference, medical malpractice, or negligence will not support a cause of

action under the Eighth Amendment. *Broughton v. Cutter Lab*, 622 F.2d 458, 460 (9th

Cir. 1980). A mere delay in treatment does not constitute a violation of the Eighth

**MEMORANDUM DECISION AND ORDER - 7**

Amendment, unless the delay causes serious harm. *Wood v. Housewright*, 900 F.2d 1332, 1335 (9th Cir. 1990).

In *Estelle v. Gamble*, *supra*, Mr. Gamble suffered a back injury while working at his inmate job when a 600-pound bale of hay fell on him. Doctors and other medical providers at the prison prescribed rest and a variety of medications, including different pain relievers and muscle relaxers. Gamble argued that the medical providers were deliberately indifferent because they should have done more to diagnosis his back problem, such as x-raying his back.

The Court disagreed, reasoning:

> Gamble was seen by medical personnel on 17 occasions spanning a 3-month period: by Dr. Astone five times; by Dr. Gray twice; by Dr. Heaton three times; by an unidentified doctor and inmate nurse on the day of the injury; and by medical assistant Blunt six times. . . . The doctors diagnosed his injury as a lower back strain and treated it with bed rest, muscle relaxants and pain relievers. Respondent contends that more should have been done by way of diagnosis and treatment, and suggests a number of options that were not pursued. The Court of Appeals agreed, stating: "Certainly an x-ray of (Gamble's) lower back might have been in order and other tests conducted that would have led to appropriate diagnosis and treatment for the daily pain and suffering he was experiencing." 516 F.2d, at 941. But the question whether an X-ray or additional diagnostic techniques or forms of treatment is indicated is a classic example of a matter for medical judgment. A medical decision not to order an X-ray, or like measures, does not represent cruel and unusual punishment. At most it is medical malpractice, and as such the proper forum is the state court under the Texas Tort Claims Act. The Court of Appeals was in error in holding that the alleged insufficiency of the medical treatment required reversal and remand. That portion of the judgment of the District Court should have been affirmed.

429 U.S. at 97-98.

**MEMORANDUM DECISION AND ORDER - 8**

Several courts have addressed the issue of deliberate indifference as it relates to prison inmates with Hepatitis C. In *Dias v. Vose*, 865 F.Supp. 53 (D.Mass. 1994), a prisoner complained that he was not receiving adequate treatment for Hepatitis C. The court denied his request, explaining:

> A disagreement as to the appropriate choice of medical treatment does not give rise to a constitutional violation because the "right to be free from cruel and unusual punishment does not include the right to the treatment of one's choice." *Layne v. Vinzant*, 657 F.2d 468, 473 (1st Cir. 1981). Indeed, "though it is plain that an inmate deserves adequate medical care, he cannot insist that his institutional host provide him with the most sophisticated care money can buy." *United States v. DeCologero*, 821 F.2d 39, 42 (1st Cir.1987).

*Dias*, 865 F.Supp. at 57.

In *Dias*, the court found no constitutional violation where the prison doctor refused to treat Dias with Interferon, a highly experimental drug with significant potential side effects. The court opined, "[w]hile Dias might have preferred a different course of treatment than the one chosen by Dr. Cohen, frustration of a prisoner's treatment wishes is not a matter of constitutional concern." *Id*. at 58.

In *Handy v. Price*, 996 F.2d 1064, 1067 (10th Cir. 1993), where the prisoner plaintiff complained of a variety of illnesses, including a knee injury and Hepatitis C, the court found that

> [t]he record does not even approach establishing a denial of adequate medical care, much less an issue relating to a culpable state of mind, i.e., a deliberate indifference with respect to Handy's medical conditions. It shows precisely the opposite. Handy's medical records show that he is a prodigious user of the medical facilities and services both at the AVCF and otherwise available through the Department of Corrections.

**MEMORANDUM DECISION AND ORDER - 9**

. . .

> A page-by-page review of Handy's medical records indicates a degree of medical treatment which would be envied by the majority of the adult population of this country which is not incarcerated.

Hence, the court found that Handy's "quarrel with the doctor as to treatment for his Hepatitis" raised no constitutional issue. *Id.*, 996 F.2d at 1067.

**3.     Discussion: Failure to Provide Care for Chronic Pain in Plaintiff's Left Hand and Neck, and for Chronic Headaches**

Plaintiff alleges that Dr. Garrett, Kim Miller, Linda Gehrke, and CMS failed to provide constitutionally-adequate care for chronic pain in Plaintiff's left hand and neck, and for chronic headaches during the time period from April 2008 to March 2009, while he was incarcerated at ICI-O, an IDOC facility (after that date, he was transferred to ICC, a private facility). All claims against Dr. Garrett have been dismissed without prejudice for Plaintiff's failure to provide a new service address for Dr. Garrett to the Clerk of Court. (Dkt. 54.) Defendants Kim Miller and Linda Gehrke did not personally interact with Plaintiff, but are, in their administrative capacity, responsible for determining whether Plaintiff's complaints set forth in his medical grievances required the prison to modify Plaintiff's treatment. (Kim Miller Affidavit, Dkt. 66-6, 3; Linda Gehrke Affidavit, Dkt. 66-3, 3-5.) Defendants argue that they have produced sufficient evidence to show that Defendants did not exhibit deliberate indifference to Plaintiff's conditions.

The critical element of the Eighth Amendment cause of action for which Plaintiff must bring forward evidence is whether Defendants' decisions to treat Plaintiff's complaints of pain with non-addictive but less-effective medication and rely on x-rays

**MEMORANDUM DECISION AND ORDER - 10**

and physical examinations between April 2008 and March 2009 was the result of deliberate indifference or professional medical judgment.

Many years ago, Plaintiff's left hand was injured and a surgery was performed, using four screws to hold his bones in place. Since that time, Plaintiff has been in and out of prison.

Plaintiff alleges that he re-injured his hand at the county jail, perhaps breaking it, in January 2007, just a few days before he re-entered IDOC custody. (Complaint, Dkt. 3, p. 4.) A January 30, 2008 evaluation by Dr. Stander of Plaintiff's left hand (predating the current claims) showed that the left hand was well-healed with no tenderness to palpation, swelling, redness, or areas of numbness. (Rory York Affidavit, ¶ 21, Dkt. 66-7.) Also in January 2008 (predating the current claims), Plaintiff "was taken off his prescribed pain medication and placed on 2400 mg of Ibuprofen and high doses of muscle relaxers against Plaintiff's wishes." (Complaint, Dkt. 3, p. 6.)

The medical care at issue is from April 2008 to March 2009. A June 4, 2008 x-ray of Plaintiff's left hand showed "an ORIF [open reduction internal fixation] of a left boxers fracture in anatomic position." (Plaintiff's Exhibit, Dkt. 77-15, p. 2.) Defendant York reviewed the x-ray and noted: "a lot of bone erosion or decalcification in area of ORIF [illegible] no new fracture or dislocation seen." (Plaintiff's Exhibit, Dkt. 77-5, p. 5.) On June 18, 2008, Plaintiff noted he had severe arthritis in his left hand. (Defendants' Exhibits, Dkt. 66-3, p. 12.)

A 2002 MRI of Plaintiff's cervical spine (predating the current claims) showed

**MEMORANDUM DECISION AND ORDER - 11**

that, while Plaintiff did not have new injuries that Defendants failed to treat, Plaintiff

nevertheless had residual symptoms from his old injuries, including a minimal amount of

arthritis and bone spurring in his cervical area that could cause pain. (Plaintiff's Exhibit

77-15, p. 2.)[2] A February 12, 2008 x-ray (predating the current claims by two months)

demonstrated normal cervical alignment and minimal cervical arthritis. (Defendants'

Exhibit, Dkt. 66-11, p. 22.)[3]

Plaintiff's complaints of pain over the 11-month period were mixed. On

examination, there were few objective signs that Plaintiff suffered from severe pain. In

fact, many of the medical providers documented the different movements Plaintiff was

able to make during examinations as he explained his issues.

On the other hand, Plaintiff verbally complained about his pain and lack of ability

to sleep due to pain, as demonstrated in the Affidavit of Inmate William Teal, who shared

a cell with Plaintiff from April 7, 2008, to April 22, 2008:

> I declare under penalty of perjury that from the time Mr. Cutler got here he
> has done nothing but complain about the pain in his hand and the pain in
> his neck and the headaches he has. I have heard him comment about the

---

[2] In addition, in 2002, a chart note stated:

> MRI of cervical spine report has returned. The report indicated that there was no
> recent injury. There was some calcific spurring which encroach on the neural foraminae
> (both sides) at the level of the C4 nerve roots. This, however, is the result of a chronic
> process– not an acute process. It may be prudent to have the patient evaluated to see if,
> indeed, there is any interference of nerve function.

(Plaintiff's Exhibit, Attachment 1-C, Dkt. 77-5, p. 4.)

[3] This x-ray has been mistakenly referred to as an MRI by Defendants. (York Aff., ¶ 22, Dkt. 66-7.)

**MEMORANDUM DECISION AND ORDER - 12**

loss of feeling he has in his hands and fingertips. He has kept me aware the entire time he has been here due to the fact he cannot sleep because of the severe pain he is in.

I have only lived with Mark for 3 weeks and the bitching and moaning is already putting a strain on our relationship. Even I, a non-medical person can see that this man needs to be put back on his proper pain medication.

(Plaintiff's Exhibit, Dkt. 77-11, pp. 8-9.)

Compounding the medical decision-making in this case are many reports in the medical records of Plaintiff's long history of "exhibit[ing] drug seeking and manipulative behavior," as Defendant Nurse Practitioner Rory York opined in his Affidavit. (York Aff. ¶ 17, Dkt. 66-7.) A note from the doctor who reviewed the 2002 MRI stated: "Since this patient has been known to embellish symptoms, I would recommend a neurology specialist that can perform sophisticated tests that do not depend entirely on patient input." (Plaintiff's Exhibit 1-C, Dkt. 77-5, p. 4.)

When Plaintiff began seeing Defendants in April 2008, he stated that he wished to be placed back on Ultram (tramadol), which is a prescription medication that is a "centrally acting synthetic opioid analgesic."[4] Dr. Garrett did not place Plaintiff on Ultram at that time. (Complaint, Dkt. 3, p. 7.) The Physicians' Desk Reference indicates that Ultram should not be prescribed for patients who are "addiction-prone."[5]

---

[4] *See* 2011 PDR 2886. It is appropriate to take judicial notice of well-known medical facts, such as those contained in the Physician's Desk Reference. *United States v. Howard*, 381 F.3d 873, 880 & n.7 (9th Cir. 2004).

[5] See 2011 PDR 2888.

**MEMORANDUM DECISION AND ORDER - 13**

When confronted with Plaintiff's request for Ultram on April 10, 2008, Rory York wrote in the chart notes:

> [Plaintiff] states he was on Ultram for past 3 years and it works, thus he needs it and other meds renewed. To this point he had not directly pointed his ire at me. When I expressed my hesitance to use an easily abused medication without significant clinical findings to support its need. He immediately turned on me and began threatening legal action.

(Defendants' Exhibits, Dkt. 66-9, p. 15.)

Nurse Carlson indicated in the Progress Notes that Plaintiff reported he had taken more of his prescribed pain medication than he should have, causing him to run out of the medication prematurely, and that he was supplementing his medication with medication from other inmates. (Defendants' Exhibits, Dkt. 66-8, p. 24.) The Affidavit of Inmate Steven Ward indicates that he gave Plaintiff a bottle of aspirin. (Steven Ward Affidavit, ¶ 1, Dkt. 77-11, p. 6.)

Another factor bearing on the medical decision-making is Plaintiff's mental health and inappropriate behavior. A Progress Note in Plaintiff's chart from April 10, 2008, states:

> [Plaintiff] essentially stormed out. I stopped him and told him that I would note that he ended the visit without exam and that should he wish to be seen once he had calmed down we would be happy to evaluate him and determine his needs at that time. he stated, "You will be sued, I will go after you personally! You have been warned!" Chart [] reveals this pattern through the past 6-8 years.

(Defendants' Exhibit, Dkt. 66-9, pp. 13-14.)

An interdisciplinary report from June 5, 2008, shows that the multi-disciplinary

**MEMORANDUM DECISION AND ORDER - 14**

team met with Plaintiff, and that Dr. Garrett concluded that "there continues to be no

medical indication of pain, that he is able to ascertain that would be causing such a level

of the inmate's description of pain." (Defendant's Exhibit 66-11, p. 13.)

> Another chart note from June 13, 2008, reads:

> Spoke to psychiatrist for insight on managing this patient in light of his MH
> diagnoses. Suggestion was made that we actually refrain from seeing him
> as frequently as we have as these frequent visits are actually
> counter-productive from the psychiatric perspective and since we have
> made it abundantly clear to the patient that there is no functional issue R/T
> his neck and hand that can be objectively documented we are not helping
> him by seeing him for the same thing over and over. Suggestion was also
> made to simply treat F/U requests that are repetitive as 1 single request.
> Patient needs firm boundaries and should not be allowed [to] manipulate
> his treatment plan through threats and anger - these are the behaviors that -
> is trying to help him modify and we don't want to hamper the progress.
> Thus we will see him at most Q - 6 weeks unless sx or presentation -'s and
> we will address -'s new issues as they arise.

(Defendants' Exhibit, Dkt. 66-9, p. 1.)

Yet another factor to consider in whether medical providers were deliberately

indifferent to Plaintiff's serious medical needs is that Plaintiff did not fully cooperate with

Defendants to aid them in diagnosing his condition. The group of professionals who

evaluated Plaintiff on May 8, 2008, asked Plaintiff to document how, aside from

generalized pain, his ailments affected his activities of daily living, but he declined the

invitation to do so. (York Aff. ¶ 25, Dkt. 66-7; Dkt. 66-9, p. 9.)

During the time period Plaintiff complains that he did not receive adequate care

and pain medication for his left hand, neck, and headaches, he received the following

medical care and treatment, some of which has been mentioned above: (1) numerous

**MEMORANDUM DECISION AND ORDER - 15**

examinations with the nurse practitioner and doctors; (2) visits from a special needs team (consisting of a doctor, mental health professional, clinical supervisor, and security officer); (3) prescriptions of ibuprofen neurontin, and Parafin Forte, a muscle relaxer (York Aff. ¶ 17; Carlson Aff. ¶ 5; Dkt. 66-8, p. 24) ; (4) a left-hand x-ray;[6] (5) input from a psychiatrist on the interplay between the mental health issues and the medical care; (6) considerations of the addicting nature of the drug he was requesting in light of his history; and (7) an invitation to participate in a self-study documenting how his pain affected his life, which Plaintiff declined.

Plaintiff argues that medical care providers can violate the Eighth Amendment if they continue to ignore repeated subjective complaints of pain, even in the face of a lack of objective symptoms. However, this is not a situation where Defendants did nothing over the course of 11 months. Rather, Plaintiff was provided with physical and mental health evaluations and painkillers during the time period at issue–April 2008 to March 2009. The issue is not whether Defendants could have done more, such as ordering neurological testing or another MRI of his spine, as Plaintiff argues;[7] rather, it is whether Defendants' level of care met the minimal constitutional standard. For example, while the x-ray taken in June 2008 showed a prior surgery with fixation devices (ORIF) and

---

[6] As noted earlier, an x-ray of Plaintiff's cervical spine was taken in February 2008 (predating his claims by two months).

[7] This claim essentially mirrors the claim rejected in *Estelle v. Gamble*, set forth herein above. 429 U.S. at 97-98.

**MEMORANDUM DECISION AND ORDER - 16**

significant bone erosion or decalcification, there was no mention that the fixation devices were loosening, a symptom that did not seem to appear until after Plaintiff's transfer. (Dkt. 77-15, p. 2.) The overall record shows that Defendants' conservative course of action to treat his left hand, back, and headache pain over 11 months was constitutionally appropriate.

After the time period in question, Plaintiff was housed at ICC, a private facility. Contrary to Plaintiff's arguments, the later records do not show that Defendants were deliberately indifferent to Plaintiff's pain during the prior time period in which they treated him, as the record reflects that Plaintiff was x-rayed, regularly evaluated, and given different painkillers in a measured manner, given Plaintiff's difficult behavior that hampered evaluation and Defendants' concerns about the addictive nature of the drugs Plaintiff sought.

The medical records of subsequent care after Plaintiff's transfer show that ICC medical personnel continued with a conservative course of treatment, prescribing Ultram when symptoms increased, ordering additional testing on the left hand when a new symptom arose, and then substituting nonaddictive painkillers when symptoms decreased. Plaintiff has submitted a pleading from the ICC Defendants in a subsequent lawsuit, outlining Plaintiff's subsequent medical history. On April 10, 2009, Dr. Stander entered the following note:

> The area of his left hand appears well healed. There is only mild tenderness. He does have some stiffness of the fingers, especially the fifth

**MEMORANDUM DECISION AND ORDER - 17**

finger of the left hand. He requests ultram, but I don't see that he has that significant of pain there. He only has mild pain of the neck also. I don't see that he has significant enough pain of the neck to warrant ultram.

(Plaintiff's Exhibit, Dkt. 77-23, p. 5.)

On April 13, 2009, Dr. Stander supplemented the current medications with a Kenalog shot for Plaintiff's left hand. (*Id.*, p. 6.) On April 30, 2009, Dr. Stander notes a very tender 1-centimeter lump over the mid portion of the left 5th metacarpel bone. Dr. Stander prescribed 100 mg tramadol (Ultram), as well as a kenalog shot for his left hand. (*Id.*)

Two new left hand x-rays were taken between December 2009 and July 2010, showing that two surgery screws were backing themselves out of placement. The screws were removed and his tendon repaired, as a result. (Dkt. 96-2, pp. 2-7.) In August 2010, Dr. Lossman discontinued Ultram and instead prescribed baclofen, Ibuprofen, and a pillow. (Plaintiff's Exhibit, Dkt. 77-6, pp. 2-3.)

Plaintiff's medical history reflects that each medical provider relied on his or her own professional judgment to determine how to Plaintiff's complaints. The fact that a patient is in chronic pain because he suffers from a condition that causes chronic pain does not show that the medical staff has been deliberately indifferent to his needs.

For example, in *Tharp v. Justice*, 2006 WL 1677884 (E.D. Tex. 2006), the court outlined the differing medical views on whether narcotic pain medication should be used to treat chronic pain conditions:

**MEMORANDUM DECISION AND ORDER - 18**

According to the National Institute of Arthritis and Musculoskeletal and
Skin Diseases (part of the National Institute of Health), analgesics such as
aspirin and Tylenol, and non-steroidal anti-inflammatory medications such
as ibuprofen and naproxen, are the most commonly used pain relievers, and
narcotics should be used only for a short time, for severe pain or pain after
surgery.[8] Other medical sources, while recognizing the potential danger of
long-term use of narcotics, take the position that the untreated pain could be
a larger problem.[9] This shows that differing views on the advisability of the
use of narcotics for chronic back problems exists in the medical
community, and the fact that the doctors in Texarkana believed that
long-term use of narcotics was not desirable does not constitute deliberate
indifference to Tharp's medical needs regardless of whether or not the
doctors in Oakdale believed this way as well. Tharp's claim on this point is
without merit. Instead, Tharp's complaint is one of disagreement with the
medical treatment received and that the treatment received has not been as
successful as he would like.

*Id.* at *17.

While not of precedential value, the reasoning of *Tharp v. Justice* is sound and

applies equally well to Plaintiff's case, where various medical providers made different

medical decisions about whether to treat chronic pain with a potentially-addictive non-

narcotic medication. The considerations used by Plaintiff's medical providers to

determine his course of treatment show that the treatment resulted from the reasonable

exercise of a professional medical opinion, and not deliberate indifference. As a result,

Plaintiff's Eighth Amendment claims regarding the type of medical care provided for his

left hand, his neck, and his headaches, are subject to summary judgment because Plaintiff

---

[8] *See* http://www.niams.nih.gov/hi/topics/pain/ backpain.htm # 10; http:// healthlink.mcw.
edu/article/1031002168.html (Medical College of Wisconsin) (noting that long-term narcotic use is not
appropriate for chronic back pain).

[9] *See, e .g.*, http://www.webmd.com/content/Article/91/101383.htm? pagenumber=2.

**MEMORANDUM DECISION AND ORDER - 19**

has failed to submit evidence on which the jury could reasonably find for Plaintiff on the element of deliberate indifference.

**4.      Discussion: Failure to provide constitutionally adequate treatment for Hepatitis C**

**A.      CMS Defendants**

Plaintiff alleges that he has been denied adequate medical treatment for his Hepatitis C (HCV) condition by CMS Defendants while incarcerated from January 2007 through March 2009. (Dkt. 41, p. 2.) Specifically, Plaintiff contends that he was denied Pegylated Interferon medication for treatment of his HCV, resulting in irreparable liver damage. (Dkt. 3-2, p. 9.) Defendants argue they clearly did not act with deliberate indifference, and that they adequately monitored, evaluated, and treated Plaintiff for his HCV based on the appropriate medical judgment of those responsible for Plaintiff's care. Defendants further contend that Plaintiff's HCV was not serious, but minor, and providing very conservative treatment was appropriate and reasonable. (Dkt. 66-4, 18.)

The critical question underlying Plaintiff's Eighth Amendment cause of action regarding his Hepatitis condition is whether Defendants' decision to not begin Pegylated Interferon treatment was a result of professional medical judgment or deliberate indifference to a serious medical need.

When a prisoner is diagnosed with HCV, the determination of whether or not a patient should be referred for liver biopsy is made on a case-by-case basis, taking into

account the patient's physical health (particularly, liver ALT levels)[10] and mental health. (Dr. Phillip Petersen Affidavit, ¶ 13, Dkt. 66-4.)[11] A liver biopsy is the most comprehensive method for assessing liver damage and, depending on the results, for determining whether a patient should begin HCV medical treatment. (*Id*. at ¶¶ 12, 14.)

After a liver biopsy, the determination of whether to provide a patient with HCV treatment, like Interferon, is determined on a case-by-case basis, determined by a medical professional, based on such factors as the "patient's presentation, clinical findings, and medical history." (*Id*. at ¶ 16.) Pegylated Interferon and Ribavirin are the two preferred drugs to treat chronic HCV. (*Id*. at ¶ 14.) The effectiveness of these drugs is largely dependent on the patient's specific genotype. (*Id.*) Only 50% of patients with genotype 1 respond favorably to the therapy and require a lengthy 48-week treatment period, whereas those patients with a 2 or 3 genotype enjoy an 80% favorable response rate and only a 24-week course of treatment is necessary. (*Id*.)

Before a biopsy and subsequent HCV treatment can be authorized, a patient must pass a mental evaluation, due to the numerous extreme side effects associated with the medication. (*Id*. at ¶ 15.) Chronic side effects of HCV medication like Pegylated Interferon include irritability, rage, severe fatigue and depression, and neuropsychiatric

---

[10] "ALT" is an acronymn for alanine amino transferase, which is an enzyme found in the blood–an increase of which can indicate liver damage. *See* www.hepatitis-central.com.

[11] Plaintiff objects to Dr. Petersen's Affidavit because Dr. Petersen was not a treating physician, but Dr. Petersen's Affidavit was made in the capacity of an expert witness, rather than a treating physician, which is permissible.

**MEMORANDUM DECISION AND ORDER - 21**

disorders. (*Id*.) Thus, the task of the medical professional is to determine for the patient whether the benefits of HCV treatment outweigh the likely risks.

Plaintiff has had HCV since 1988. (York Aff., ¶ 8, Dkt. 66-7.) On January 19, 2007, medical staff referred Plaintiff to the Chronic Care Clinic (CCC) for HCV treatment and monitoring, as a result of a laboratory report indicating Plaintiff had increased "liver function tests." (*Id*. at ¶ 7.) Another laboratory report from April 12, 2007, indicated that Plaintiff was positive for HCV, and an HCV profile was ordered, with continued referral to the CCC. (*Id*.)

Dr. Dawson evaluated Plaintiff on September 6, 2007, sending his urine to the lab for a urinalysis. (*Id*. at ¶ 8.) Dr. Stander evaluated Plaintiff on October 10, 2007, noting that the urinalysis result was normal. (*Id*.) New laboratory results were reported on December 5, 2007, indicating rising LFTs. (*Id*.)

Next, plans were made for a mental health examination and biopsy, but the consultation for the biopsy was delayed because of prison transfers. To summarize his transfers, the Court notes that, on July 3, 2007, Plaintiff was transferred from SICI to ISCI. (*Id*. at ¶ 8.) On March 19, 2008, Plaintiff was transferred from ISCI to IMSI. (*Id*. at ¶ 9.) On April 7, 2008, Plaintiff was transferred from IMSI to ICI-O, where he remained until March 2009, when he was transferred to ICC, a private prison where Defendant CMS is not the medical provider. (*Id*. at ¶ 10.)[12]

---

[12] Plaintiff alleges that the large number of prison transfers within a short period of time was an intentional design to deny Plaintiff HCV treatment. However, as the Court concludes, more or different

**MEMORANDUM DECISION AND ORDER - 22**

Upon arriving at ICI-O on April 7, 2008, Plaintiff was extremely agitated, which resulted in the doctor cutting short the evaluation due to Plaintiff's behavior. (*Id.* at ¶ 10.) Ultimately, the doctor did not recommend HCV treatment at that time. *(Id.)* Plaintiff continued to request a liver biopsy and HCV treatment, despite several subsequent physical and mental evaluations concluding treatment was not recommended. (*Id.* at ¶ 12.) Eventually, on October 29, 2008, it was determined that Plaintiff was stable on his psychiatric medications and could have a biopsy and HCV treatment if his LFTs[13] indicated that both were needed. (*Id.* at ¶ 13.)

On December 8, 2008, Defendant York made a consultation request for Plaintiff's liver biopsy and found Plaintiff's LFT levels to be ALT 129, AST 67 with a 1A genotype. (*Id.* at ¶ 14.) Carl Dettwiler, M.D., of Lewis Clark Gastroenterology, evaluated Plaintiff on January 14, 2009 and recommended proceeding with the liver biopsy. (*Id.* at ¶ 14.) Dr. Dettwiler[14] noted that Pegylated Interferon treatment could be postponed should there be no or minimal changes to Plaintiff's liver on the biopsy. (*Id.*) On February 18, 2009, a successful ultrasound-guided liver biopsy was obtained, indicating HCV. (*Id.* at ¶ 15.)

HCV treatment was not required under the Eighth Amendment, and, therefore, the transfers had no causal effect.

[13] LFT is an acronym for Liver Function Test, which tests ASP (aspartate amino transferase) and ALT (amino alanine transferase) enzyme levels. *See* www.hepatitis-central.com.

[14] Dr. Dettwiler's name sometimes appears in the record with a different spelling–"Dettwiller."

Alan Peterson, M.D., of Pathologists' Regional Laboratory,[15] upon microscopic analysis,

determined that Plaintiff had only mild chronic HCV. (*Id.*) Plaintiff's HCV was merely a

Grade 1 of 4 with only minimal fibrosis at Stage 0-1 of 4. (*Id.*)

Based on these results, Pegylated Interferon treatment was determined to be

unnecessary, especially when weighed against the severe risks associated with the

extreme side-effects accompanying treatment. (*Id.* at ¶ 16.) Moreover, Plaintiff is a

genotype 1A which makes his chance of responding favorably to the treatment was only

50% and he would require a lengthy 48-week course of treatment. (Petersen Aff., ¶ 20,

Dkt. 66-4.)    When Plaintiff was last seen in the CCC, he was provided HCV education,

and he reported he felt good. (York Aff. ¶¶ 15, 5, Dkt. 66-7.)

Plaintiff alleges that his HCV condition is very serious and he has been

continually demanding treatment for it. Plaintiff claims that CMS medical staff violated

his Eighth Amendment rights by being deliberately indifferent to Plaintiff's "serious"

HCV condition by not providing him with Pegylated Interferon treatment, which Plaintiff

alleges caused irreparable harm and damage to his liver. The monitoring of Plaintiff's

HCV condition by prison medical staff has included: (1) numerous examinations with

various medical staff and doctors for both his physical and mental health; (2) several

LFTs and lab testing to monitor his liver health; (3) a liver biopsy and subsequent

microscopic diagnosis by pathologist Dr. Peterson; and (4) HCV education.

---

[15] Note that Dr. Phillip Petersen, Defendants' expert witness, is different from Dr. Alan Peterson, who performed the biopsy analysis.

**MEMORANDUM DECISION AND ORDER - 24**

Plaintiff is not a medical professional. Differences in judgment between an inmate and prison medical personnel regarding appropriate medical diagnosis and treatment are not sufficient to establish a deliberate indifference claim. *Sanchez*, 891 F.2d at 242. Plaintiff's HCV condition was identified and acknowledged by CMS medical staff upon his initial incarceration and has subsequently been monitored at each correctional facility where Plaintiff has spent time.

The records show that the medical professionals have made careful judgments about the course of Plaintiff's treatment, based on many considerations, including the grade of HCV, his genotype, and his mental health issues. Plaintiff has been provided with more than adequate medical care for his mild chronic HCV condition, and the record reflects no deliberate indifference. Thus, Defendants are entitled to summary judgment. To the extent that Defendant Rona Siegert joins in the Motion for Summary Judgment, she is also so entitled to summary judgment.

### B.    CMS Entity

Plaintiff also brings claims against the entity Correctional Medical Services (CMS), alleging Defendant CMS has a policy or custom of providing substandard medical care to inmates, which amounts to deliberate indifference. (Dkt. 3, p. 16.) Based on the records, Plaintiff has not met his burden to proceed to trial. Thus, Defendant CMS is entitled to summary judgment.

To bring a civil rights claim against a municipality, local governing body, or

**MEMORANDUM DECISION AND ORDER - 25**

private entity performing a public function, a plaintiff must allege sufficient facts in the complaint meeting the test articulated in *Monell v. Department of Social Services of City of New York*, 436 U.S. 658, 69-194 (1978): (1) the plaintiff was deprived of a constitutional right; (2) the entity had a policy or custom; (3) the policy or custom amounted to deliberate indifference to plaintiff's constitutional right; and (4) the policy or custom was the moving force behind the constitutional violation. *See Mabe v. San Bernardino County, Dep't of Pub. Soc. Servs.*, 237 F.3d 1101, 1110-11 (9th Cir. 2001).

The Court finds that no member of Defendant's medical staff acted with deliberate indifference in depriving Plaintiff of a constitutional right. Thus, Plaintiff's claim that Defendant CMS had a policy or custom of acting with deliberate indifference has no factual basis. To support a finding of a policy or custom of acting deliberately indifferent, the employees of the entity must be acting in accordance to this policy. Here, Defendant's medical staff did not act with deliberate indifference, and so such a policy or custom cannot be found to have existed.[16]

Plaintiff alleges that denying "inmates who are genotype 1-A clearly shows definitively that policy is in place disfavoring treatment for these inmates." (Dkt. 77, p. 13.) Even if this can be construed as a "policy," Plaintiff has not shown that it is a policy that amounts to deliberate indifference. There is nothing in the record showing that if an inmate was genotype 1A, had stable mental health, and had a higher grade of fibrosis, he

---

[16] For this reason, Plaintiff's assertions that Defendants would not provide policy-related discovery responses to him need not be addressed.

**MEMORANDUM DECISION AND ORDER - 26**

would not be given treatment. Dr. Petersen opined: "The presence of moderate to severe fibrosis and inflammation and necrosis on a liver biopsy best determines who should be offered antiviral therapy for HCV," and "the determination to provide Hepatitis C treatment such as Interferon is determined on a case-by-case basis based upon the education, training, and experience of a medical provider, and after consideration of such factors as the patient's presentation, clinical findings, and medical history." (Petersen Aff., ¶¶ 14, 16, Dkt. 66-4.) The "policy" set forth in Dr. Petersen's supporting Affidavit adequately weighs the benefits and risks of HCV treatment to patients on an individual basis and does not amount to deliberate indifference.

Plaintiff further alleges that Defendant CMS had a policy of acting only in its interest of sustaining a profitable company without regard to the inmate patients' medical needs. This allegation fails because the records clearly show that: (1) Plaintiff has sufficient access to medical services at each institution where he has been incarcerated, as outlined herein above; (2) Defendants have used their medical judgment to monitor Plaintiff's medical conditions, and have taken medically reasonable steps to treat them; (3) Plaintiff has been provided with psychological evaluations to determine if he is stable enough mentally to begin HCV treatment, should his LFTs indicate it is needed; (4) Plaintiff has had several lab tests taken to monitor his enzyme levels and a liver biopsy procedure which indicated that HCV treatment was not needed at that time; and (5) Plaintiff has been provided with HCV education.

**MEMORANDUM DECISION AND ORDER - 27**

Thus, Defendant CMS has shown that there is no material issue of fact in dispute as to the policy claims. As noted above, the individual Defendants are also entitled to summary judgment on all claims. Accordingly, Plaintiff's entire action will be dismissed with prejudice, other than those claims against Dr. Garrett, which have been dismissed without prejudice.

## ORDER

**IT IS ORDERED:**

1.    Plaintiff's Motion to Expedite Summary Judgment ruling (Dkt. 86) is GRANTED.

2.    Defendants' Motions for Summary Judgment (Dkt. 66, 71) are GRANTED. Plaintiff's entire case is DISMISSED.

3.    Plaintiff's Motion Informing the Court (Dkt. 95) is DENIED to the extent that it requests the Court to pursue criminal charges against Defendants for mistakes in their briefing. Defendants, however, are advised to exercise greater caution in reviewing and summarizing medical records and in preparing affidavits and briefing in the future.

DATED:  **September 26, 2011**

Honorable B. Lynn Winmill
Chief U. S. District Judge